UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PHILIP OLSEN,
    Plaintiff,

v.                                              C.A. No. 17-007-M-LDA

THE PROVIDENCE JOURNAL, CO.,
LYNN ARDITI, and RICHARD ASINOF,
    Defendants.

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Judge.

Before the Court, at the motion to dismiss stage, is a defamation case that asks a simple question: does the fair report privilege apply?

Rhode Island state officials hosted a press panel at the Adult Correctional Institutions ("ACI") to discuss a drug-treatment program for inmates. Several state officials and inmates spoke at the event. One of those inmates, Crystal Olsen, talked about her battle with addiction and withdrawal, and told a story about how her father prostituted her at the age of fourteen and started her on her heroin addiction. Defendant Lynn Arditi covered the press event and published an article online and in the newspaper of the *Providence Journal*, which included Ms. Olsen's story about her father, Plaintiff Philip Olsen. An internet news website, ConvergenceRI.com, posted a news story repeating the *Providence Journal*'s report of Ms. Olsen's story. But the ConvergenceRI went one step further, using

Ms. Olsen's story to pose a series of hypothetical questions, such as, "Why exclude that part of Olsen's story about her father's abuse from the [op-ed] column?"

In response to the articles, Mr. Olsen filed suit, claiming Ms. Olsen's story is false, and therefore the Defendants' stories are defamatory. The Defendants, in turn, have moved to dismiss the suit, asserting the fair report privilege. Because the Court finds that the privilege applies in this case, the Defendants' Motions to Dismiss (ECF Nos. 6 and 9) are GRANTED.

## BACKGROUND

Rhode Island's Executive Office of Health and Human Services and Rhode Island's Department of Corrections held an open-press panel discussion featuring corrections officials and inmates. The purpose of this press event was for state officials to discuss the success of its medication-assisted drug-treatment program implemented at the ACI. The panel discussion included an official from the Rhode Island Executive Office of Health and Human Services; three officials from the Rhode Island Department of Corrections; the White House Director of National Drug Control Policy, Michael Botticelli; and inmates from the ACI. During the panel discussion, government officials highlighted the benefits of medically treating (e.g., with methadone or suboxone (buprenorphine and naloxone)) inmates addicted to opioids.

At some point during the event, government officials escorted four ACI inmates on stage, including Crystal Olsen. Ms. Olsen recounted her struggle with

opioid addiction and the horrors of going through withdrawal without medication-assisted treatment. Relevant to this case, she went on to say:

> I guess that [my father] started me using heroin and that led to him prostituting me because he was also a drug addict and he needed to support his habit and now I ended up with a drug habit that needed to be supported also.

After attending the press event, Ms. Arditi[1] wrote a news article titled "U.S. drug czar Michael Botticelli calls RI a national leader in treating drug-addicted inmates," which was posted on the *Providence Journal*'s website. The newspaper's print edition published an identical version of the article the following day, under the headline "Looking to R.I. as a model / U.S. drug czar cites treatment of drug-addicted inmates." The articles began by outlining the White House drug czar's visit to the ACI and then stated that the Obama administration plans to replicate the ACI's medication-assisted drug-treatment program on a national level. The articles go on to discuss how few prisoners have access to medication-assisted treatment.

The *Providence Journal* articles then recapped Ms. Olsen's story. The relevant portions began with Ms. Olsen's description of withdrawal: "I lay on my bed shaking, throwing up, going to the bathroom." After discussing the logistics and costs of the drug-treatment program, the articles included the following:

> Olsen, the mother who described going into withdrawal in her cell, said she was 14 when she began using heroin with her father, who was a

---

[1] At the time, Ms. Arditi was a *Providence Journal* reporter. She is no longer with the *Providence Journal* and has recently become the health reporter for Rhode Island Public Radio.

3

drug addict. She said he prostituted her to support his habit. "The opiates would stop me from feeling what I've been through," she said.

The articles ended with this quote from Ms. Olsen: "'Every time I come into prison I have had to be taken off [methadone],' she said. 'I relapse every time I leave jail because I've been taken off my methadone. I hope that it works this time.'"

Two weeks later, the *Providence Journal* published an op-ed piece—"Michael Botticelli and Gina M. Raimondo: R.I. makes progress on addiction"—jointly authored by U.S. Drug Czar Michael Botticelli and Rhode Island Governor Gina M. Raimondo. This piece discussed Rhode Island's medication-assisted drug-treatment program in the state's prison system and the positive impact it has on prisoners. While the article expressly referred to Ms. Olsen's experience with the program, it did not mention Ms. Olsen's comments about her father.

Two days later, Richard Asinof published an article on his website-based newsletter, ConvergenceRI, titled "Heroin, sexual abuse, prison, methadone, and the promise of recovery." Mr. Asinof's article discussed both the *Providence Journal's* article that reported on the press event and the op-ed piece by the governor and drug czar. The relevant portions of Mr. Asinof's article are replicated below:

> One of the most telling moments in the presentation came when the first mother, Crystal Olsen, told the story of how she became a heroin addict. Her father, a heroin addict, shot her up when she was just 14, and then forced her to become a prostitute to support his habit.
>
> \*   \*   \*
>
> Why exclude that part of Olsen's story about her father's abuse from the [op-ed] column?

4

> If you don't talk about it or acknowledge it in a truthful fashion, does it get swept under the rug as an inconvenient fact?
>
> Where were the authorities—from school, from the police, from the community—who somehow failed to protect a girl of 14 from being turned out on the street as a prostitute by her father?

In Mr. Olsen's two-count Complaint, he alleges that the statements his daughter made about him are false, and therefore the publication of Ms. Olsen's statements was defamatory. The Defendants have filed Motions to Dismiss (ECF Nos. 6 and 9) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting the fair report privilege.

## LEGAL STANDARD[2]

To survive a motion to dismiss, a plaintiff's complaint need not establish a prima facie case. *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014). However, the complaint must set forth a plausible claim for relief. *Flock*

---

[2] Mr. Olsen suggests that the Court should treat the Rule 12(b)(6) Motions as Rule 56 Motions for Summary Judgment because the *Providence Journal* and Ms. Arditi rely on extraneous documents. Ordinarily, a court may not consider documents that are outside the complaint and not expressly incorporated in the complaint. *Graf v. Hospitality Mut. Ins. Co.*, 754 F.3d 74, 76 (1st Cir. 2014). It is well established, however, that courts may, in certain circumstances, consider certain extrinsic material without converting a motion to dismiss into a motion for summary judgment. *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016). "These exceptions include 'documents the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to plaintiffs' claim; [and] . . . documents sufficiently referred to in the complaint.'" *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013) (alterations in original) (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). Because the exhibits the Court looks to—the published articles and video of the press panel—are expressly referenced in the Complaint, and because the exhibits' authenticity has not been challenged, the Court properly considers these documents without converting the Motions to Dismiss into Motions for Summary Judgment. *See Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 137 n.4 (1st Cir. 2005).

v. *U.S. Dep't of Transp.*, 840 F.3d 49, 54 (1st Cir. 2016). And "the elements of a prima facie case are relevant to the plausibility assessment, forming 'part of the background against which a plausibility determination should be made.'" *Medina-Velázquez*, 767 F.3d at 108 (quoting *Rodríguez–Reyes v. Molina–Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013)).

The plausibility determination is a two-step process. First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Id.* at 108 (quoting *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013)). Second, the Court "must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *A.G. ex rel. Maddox*, 732 F.3d at 80).

In reviewing a motion to dismiss based on an affirmative defense, the Court must determine whether the defense is (1) "definitively ascertainable from the complaint and other allowable sources of information" and (2) "suffice[s] to establish the affirmative defense with certitude." *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008) (quoting *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006)).

## DISCUSSION

The Defendants invoke the fair report privilege and ask the Court to dismiss Mr. Olsen's Complaint. The fair report privilege "immunizes the publisher from liability for defamation if what is published is a 'fair report' of (*inter alia*) an official

6

action or proceeding." *Trainor v. The Standard Times*, 924 A.2d 766, 772 (R.I. 2007). The privilege extends to "a meeting open to the public that deals with a matter of public concern." *Id.* (quoting Restatement (Second) of Torts § 611 (1977)).

Mr. Olsen disputes the applicability of the privilege for all three Defendants and argues abuse of the privilege by Mr. Asinof. As for the applicability of the privilege, it is Mr. Olsen's position that the privilege only extends to reports of reliable government officials who speak at official proceedings. Furthermore, he claims that the privilege only extends to statements related to the matter of public concern that formed the basis of the official proceeding. On the abuse score, Mr. Olsen believes that Mr. Asinof forfeited the privilege, because the ConvergenceRI added rhetorical questions that intensified the sting of Ms. Olsen's statements and implied the truthfulness of those statements.

I. Applicability of the Privilege

In claiming protection under the fair report privilege, the Defendants maintain that their news articles provided a fair and accurate report of the press panel—an official proceeding. Whether or not this privilege applies is a question of law. *Id.* at 770.

Before reaching the meat of the disputes among the parties, the Court begins by holding that the public panel discussion hosted by Rhode Island's Executive Office of Health and Human Services and the Rhode Island's Department of

Corrections at the ACI fits the bill of an official proceeding.³ The press panel was sponsored by two government agencies, touting the government's medication-assisted drug-treatment program for prisoners at the ACI. The participants in the press panel included an official from Rhode Island's Office of Health and Human Services, officials from Rhode Island's Department of Corrections, and the White House Director of National Drug Policy. It cannot be gainsaid that a public press event hosted by various government actors for the express purpose of discussing a government program does not constitute an official proceeding. *See, e.g., Kilgore v. Younger*, 640 P.2d 793, 776 (Cal. 1982) (finding that a press conference hosted by the attorney general is an official proceeding); *see also Howell v. Enter. Publ'g Co., LLC*, 920 N.E.2d 1, 18 (Mass. 2010) (noting that the fair report privilege applies to press conferences) (citing *Jones v. Taibbi*, 512 N.E.2d 260, 267 (Mass. 1987)); *Thomas v. Telegraph Publ'g Co.*, 929 A.2d 993, 1010 (N.H. 2007) (same); *Magnusson v. N.Y. Times Co.*, 98 P.3d 1070, 1075 (Okla. 2004) (same).

In addition, Mr. Olsen does not challenge—and this Court determines—that the articles were a fair and accurate report of the official proceeding. The articles discussed the medication-assisted drug-treatment program and Ms. Olsen's story without changing the details, thereby providing a "rough-and-ready summary" of the official proceeding. *Yohe v. Nugent*, 321 F.3d 35, 43 (1st Cir. 2003).

Now that the Court has snatched all the low-hanging fruit, it proceeds to the disputed issues. Mr. Olsen challenges the applicability of the fair report privilege to

---

³ Mr. Olsen accepts this, or at least does not challenge this point in his briefing.

8

the reports on Ms. Olsen's statements during the press panel, arguing that the privilege does not extend to statements made by "an inmate serving a jail sentence." Instead, in Mr. Olsen's mind, the privilege only applies to speakers who are "responsible authoritative decisionmaker[s]"—that is, reliable government officials. Mr. Olsen has not cited authority for this proposition—that the privilege binds itself to a speaker, not a proceeding.

In attacking the character of the speaker, though, the Court finds Mr. Olsen whistling past the graveyard—for the privilege, as elucidated by the Rhode Island Supreme Court, "protects the publication of fair and accurate reports of public meetings and judicial proceedings." *Martin v. Wilson Publ'g Co.*, 497 A.2d 322, 328 (R.I. 1985). In other words, the privilege applies to reports of meetings, not reports of certain individuals at meetings. This distinction is made patently clear by the policy consideration underlying the privilege: "facilitating [the] dissemination of information about judicial and governmental proceedings." *Id.* at 329.[4] Because the public has a strong interest in knowing what occurs at an official proceeding, reporters are granted protection in relaying a fair and accurate account of that information to the public. In essence, the rule supports a social good—allowing the whole public to attend the official proceeding without actually having to be present at the proceeding.

---

[4] Two closely related policy considerations also underlie the privilege: (1) agency theory—that is, reporters acting as agents for individuals of the public who might have attended the proceeding—and (2) public supervision—i.e., oversight over government action. *See Medico v. Time, Inc.*, 643 F.2d 134, 140–41 (3d Cir. 1981).

9

Mr. Olsen's attempt to establish a new rule, one that limits the privilege to "responsible authoritative decisionmaker[s]," undercuts the policy consideration and would effectively disable the privilege. A speaker's reliability is not obvious on its face, so reporters would be forced to investigate a speaker's character, which conflicts with the privilege's requirements. *See Trainor*, 924 A.2d at 772 ("[P]ursuant to the fair report privilege, a reporter is not required to conduct an independent investigation or to verify what is contained in the official document about which he or she is reporting."). Furthermore, a reliability component, even setting aside the investigation problem, would still force a difficult, fact-specific decision on the part of the reporter for drawing the line between reliable and unreliable, and a wrong choice will burst the privilege bubble. This, undoubtedly, would hollow out the privilege.

Shifting the focus away from the reporter and back on to the general public, the Court also notes that Mr. Olsen's rule will limit the information disseminated to the public. If a reporter did her due diligence and deemed a speaker unreliable, then the reporter could no longer report on the speaker's statements, even if the reporter had no reason to believe the statements were false. Consequently, the public would not receive information on a portion of the official proceeding. This would hold true for a requirement that the speaker be a public official as well.

As described above, the fair report privilege is rooted in access to accurate information, rather than indicia of reliability. The fact that Mr. Olsen may be able to impugn the reliability of the speaker is, therefore, beside the point, as is the fact

10

the Ms. Olsen was not a public official. The public interest lies in that something was said at the official proceeding, regardless of whether it turns out to be a truth or an untruth. On this front, Ms. Olsen spoke at the official proceeding, at the government's request, to showcase a prison's drug-rehabilitation program. Ms. Olsen was very much a part of the proceeding. *Cf.* Restatement (Second) of Torts § 611 cmt. d (1977) (speaking about reports of official *proceedings*).

Mr. Olsen makes one final plea for why the fair report privilege should not attach to a report on Ms. Olsen's statements: Ms. Olsen's statements were not a matter of public concern. Though, in cobbling together this argument, Mr. Olsen does not challenge—and this Court finds—that a government-sponsored drug-treatment program for prisoners is a matter of public concern.[5] Instead, Mr. Olsen concludes that Ms. Olsen's drug dependency and prostitution are private matters that only affect her.

Ms. Olsen's statements were directly related to, and in furtherance of, the official proceeding. She discussed her experience with the government program, and in doing so, she talked about the origin of her drug problems. Discussing the effects of addiction on prisoners highlights the necessity of the drug-treatment program that the government showcased at the panel discussion. In total, Ms. Olsen's personal experiences with drug addiction are intertwined with the

---

[5] Also worth mentioning, the fair report privilege covers official proceedings *or* meetings of public concern, *Trainor v. The Standard Times*, 924 A.2d 766, 770 (R.I. 2007) (quoting Restatement (Second) of Torts § 611 (1977)), so the Rhode Island rule, as is, does not impose a separate requirement that the official proceeding be of public concern. And, for that matter, an official proceeding is, ipso facto, a matter of public concern.

official proceeding, as she is an individual participant in the government's drug-treatment program.[6]

All of this is to say that neither the privilege itself nor the policy consideration behind the privilege support Mr. Olsen's position. For these reasons, the Court finds the fair report privilege unreceptive to Mr. Olsen's attempts at line drawing. The fair report privilege, thus, covers the Defendants' articles.

II.  Forfeiture of the Privilege

The fair report privilege is not absolute and may, in certain circumstances, be forfeited. The main policy reason that drives the privilege—dissemination of information to the public—also informs a deliberate, form-fitting application of the privilege. For while the public has an interest in what occurs at an official proceedings, the public does not necessarily have an interest in reports that escape the bounds of the proceeding. Borne out of this fine line is a rule of forfeiture, when a reporter "make[s] additions of his [or her] own that would convey a defamatory impression," "impute[s] corrupt motives to any one," or "indict[s] expressly or by innuendo the veracity or integrity of any of the parties." Restatement (Second) of Torts § 611 cmt. f (1977). Consistent with the Restatement, when the article carries a greater "sting" than the original proceeding, then the fair report privilege has been abused and thus forfeited. *Lavin v. N.Y. News, Inc.*, 757 F.2d 1416, 1419 (3d Cir. 1985); *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 271–72 (7th Cir. 1983). Unlike the applicability of the privilege, abuse of the privilege is

---

[6] In the interest of judicial modesty, the Court assumes, without deciding, that the fair report privilege imposes a requirement that the statement bear relevance to the official proceeding.

ordinarily a jury question, "unless the facts are such that only one conclusion can reasonably be drawn." *Lavin* 757 F.2d at 1419 (quoting Restatement (Second) of torts § 619 cmt. b (1977)).

The *Providence Journal* escapes Mr. Olsen's sites, as he hones in on the ConvergenceRI article, claiming that Mr. Asinof's article forfeited the fair report privilege. In this chord, Mr. Olsen hits two notes: (1) the ConvergenceRI article transforms the meaning of the proceeding, and (2) the article editorializes by posing hypothetical questions. The relevant portions of the ConvergenceRI article are reproduced below:

> One of the most telling moments in the presentation came when the first mother, Crystal Olsen, told the story of how she became a heroin addict. Her father, a heroin addict, shot her up when she was just 14, and then forced her to become a prostitute to support his habit.
>
> "I ended up with a drug habit that needed to be supported. I used drugs a lot because of the trauma I had been through. The opiates would stop me from feeling what I've been through," Olson said.
>
> "I've been back and forth to prison, doing illegal things, prostituting, stealing cars, shoplifting. I lost my fiancé to an opiates overdose," she continued, sharing that she had two you daughters, ages 6 and 9.
>
> "I've been on methadone for 19 years, and every time I've come into prison, I've had to be taken off it."
>
> \* \* \*
>
> Why exclude that part of Olsen's story about her father's abuse from the column? If you don't talk about it or acknowledge it in a truthful fashion, does it get swept under the rug as an inconvenient fact?
>
> Where were the authorities—from school, from the police, from the community—who somehow failed to protect a girl of 14 from being turned out on the street as a prostitute by her father?

It is uncontroverted that Ms. Olsen, at the press conference, said that her father shot her up with heroin when she was fourteen years old and prostituted her to sustain his addiction. In reporting on Ms. Olsen's story, while the ConvergenceRI article may have dedicated more space to Ms. Olsen's drug-addiction story, the ConvergenceRI did not add anything to the story, at least not in the first four paragraphs above.

The next two paragraphs, however, go beyond a mere regurgitation of Ms. Olsen's comments at the press panel. This part of the article takes Ms. Olsen's statements and flips them into a series of rhetorical questions, aimed at institutional actors. In doing so, Mr. Asinof walks a tight rope, where one misstep, such as treating Ms. Olsen's comments as true, will send him sailing past the fair report privilege's safety net.

While discussing a story in the past tense may, in some instances, imply the truthfulness of the statements, here, the ConvergenceRI explicitly says "Olsen's story" prior to the rhetorical questions. The questions that follow merely recycle Ms. Olsen's statements, which were limned in quotes in the proceeding paragraphs and attributed to Ms. Olsen. For these reasons, only one conclusion can be drawn: the article neither added commentary nor implied the truthfulness of Ms. Olsen's story.

Accordingly, Mr. Asinof did not abuse the privilege.

## CONCLUSION

The fair report privilege protects the Defendants' reports of the government proceeding from Mr. Olsen's defamation action, and Mr. Asinof's article did not forfeit this privilege. Therefore, the Defendants' Motions to Dismiss (ECF Nos. 6 & 9) are GRANTED.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

August 21, 2017